NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SARAH C., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.C., *Appellees*.

No. 1 CA-JV 20-0379
FILED 7-20-2021

Appeal from the Superior Court in La Paz County
No. S1500JD201800014
The Honorable Jessica L. Quickle, Judge

**AFFIRMED**

COUNSEL

Carr Law Office PLLC, Kingman
By Sandra Carr
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Maria Elena Cruz joined.

---

**H O W E**, Judge:

**¶1**         Sarah C. ("Mother") appeals the juvenile court's order terminating her parental rights to J.C.[1] For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**         Mother gave birth to J.C., her fourth child, in September 2010. Before J.C. was born, Mother's sister obtained voluntary guardianship over Mother's three other children. When J.C. was five, his maternal grandmother became his primary caregiver while Mother cared for him on some weekends.

**¶3**         In July 2017, the Department received a report that J.C. had said that Mother's boyfriend had punched him. Later, in October 2018, the Department received a report that J.C. had a cigarette burn on his neck, that his grandmother pinched him if he misbehaved, and that he ran away to a neighbor's house on several occasions. When the Department investigated, J.C. first said that the burn mark was from the sun but then stated that he "probably got burned by a cigarette." J.C. also disclosed that the previous night, Mother's boyfriend had grabbed him by the shirt and threw him against the wall. Mother did not know how J.C. got burned and denied that her boyfriend physically abused him.

**¶4**         Thereafter, the Department removed J.C. from Mother's care, placed him with his maternal grandmother, and petitioned for dependency. The following day, Mother told the Department that her brother— who lived with the maternal grandmother—had abused her other children. The Department then placed J.C. in a foster home and later placed him with his maternal aunt. J.C. was found dependent in March 2019.

**¶5**         The Department referred Mother for services including parent aide services, supervised visitation, psychological evaluations, a

---

[1]     The juvenile court also terminated J.C.'s father's parental rights based on abandonment, but he is not a party to this appeal.

bonding and best interests' assessment, MiKid parent-support services, urinalysis testing, and transportation. The Department also asked Mother to engage in individual counseling.

¶6 Mother successfully completed "a rule out urinalysis testing" through TASC. In March 2019, Mother completed a psychological evaluation with Dr. Ellen Diana. Mother was diagnosed with narcissistic personality disorder. A person with this diagnosis is self-absorbed and puts his or her needs before the needs of others, which can result in the neglect or abuse of children. Dr. Diana recommended family therapy only after Mother had made "sufficient progress in [individual] therapy."

¶7 Mother participated in individual counseling but denied having any symptoms of a personality disorder and said that she did not need counseling. Mother and her boyfriend attended most of the sessions together and focused a majority of counseling on their relationship, rather than J.C. Mother also participated in the parent aide service, but that service was closed out because Mother was not able to enhance her diminished capacities for recognizing threats, recognizing J.C.'s needs, and understanding her protective role.

¶8 Mother participated in supervised visitation with J.C. on a weekly basis, but J.C. requested that the visits occur every two weeks and then Mother reduced the length of those visits from four hours to two hours. Mother also had issues attending visitation and refused transportation from the Department because her boyfriend "did not want her in the car with another man." Mother also repeatedly requested that her boyfriend be allowed to attend the supervised visits even though J.C. was adamant that he did not want to see Mother's boyfriend.

¶9 In April 2020, the Department referred Mother to Dr. Latoya Smart for a second psychological evaluation. Dr. Smart diagnosed Mother with a personality disorder involving antisocial and narcissistic traits. Persons with these traits are self-absorbed, deny personal shortcomings, deny the need for improvement or change, and do not admit mistakes. A person with this diagnosis is not attuned to a child's needs and puts their own needs and their intimate partner's needs before the child's needs. Dr. Smart noted that Mother had numerous opportunities "to improve her parenting capabilities and she has either refused services deeming that she has no need for them or terminated unsuccessfully[.]" Therefore, Dr. Smart stated, "it is not expected nor recommended that [Mother] be provided any additional services."

¶10 In May 2020, the Department moved to terminate Mother's parental rights based on mental illness and 15 months' out-of-home placement grounds. At the termination hearing, the Department's case manager testified that Mother has not been able to remedy the circumstances that caused J.C.'s out-of-home placement because—even though she had participated in services—Mother had made no progress toward adjusting her mental health or improving her protective capacities. Because Mother has not made the required behavioral changes, the case manager opined that Mother would be unable to exercise proper and effective parental care and control in the future. She testified that J.C. is in an adoptive placement that is meeting his needs and that J.C. would be harmed if returned to Mother because his needs would not be a priority.

¶11 Dr. Diana testified that J.C. told her that he was sent to live with his grandmother because Mother did not want to be a mother anymore. She testified that when she observed Mother with J.C., Mother was "dismissive of his emotional needs throughout almost the entire observation." When Mother visited with J.C., she was often eager for the visits to end, watched the time, and focused more on her other obligations at home. Dr. Diana also testified that Mother believes that her parenting ability is fine and that she does not need to improve her parenting skills. She testified that she was concerned that if J.C. were returned to Mother, J.C. would be at risk of further neglect, physical abuse, and would struggle to develop an identity because of Mother's narcissistic personality disorder.

¶12 Dr. Smart testified that Mother puts her and her boyfriend's needs before J.C.'s needs by dismissing J.C.'s allegation that Mother's boyfriend had thrown him into a wall. She testified that Mother could not safely parent J.C. in the foreseeable future because Mother puts her needs before J.C.'s, did not fully engage in services, and refused to participate in therapeutic services. She opined that returning J.C. to Mother would be harmful to J.C. because Mother would continue to put her needs before J.C.'s and J.C. would likely suffer emotional neglect and physical abuse. Dr. Smart also testified that when comparing her evaluation of Mother to Dr. Diana's evaluation from April 2019, Mother's unaddressed narcissistic personality disorder was still a significant issue.

¶13 Mother testified that J.C. has never said that he was afraid of her boyfriend. She testified that J.C. is not in any danger at his grandmother's house and that she believed that J.C. got the cigarette burn at a friend's or neighbor's house. She also testified that she thinks J.C. made up the story of how he got the burn mark and that he "lies a lot." Mother testified that she does not need counseling because she believes that

4

nothing is wrong with her. She also testified that if J.C. were returned to her, he would be living with her and her boyfriend. She admitted that in August 2019 and July 2020, both she and her boyfriend were arrested for domestic violence.

¶14 Following the termination hearing, the juvenile court terminated Mother's parental rights based on mental illness and 15 months' out-of-home placement grounds. The court found that Mother refused to acknowledge her mental health diagnosis and made no progress while participating in the services the Department had offered. Mother timely appealed.

## DISCUSSION

¶15 Mother argues that no reasonable evidence supports the juvenile court's termination order. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). We will affirm an order terminating parental rights so long as reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009). To terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground in A.R.S. § 8–533 has been proven and must find by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002).

¶16 To terminate parental rights on mental illness grounds, the juvenile court must find clear and convincing evidence that the parent is unable to discharge parental responsibilities because of mental illness and "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8–533(B)(3). The Department must also make a diligent effort to provide appropriate reunification services. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶¶ 33–34 (App. 1999).

¶17 Reasonable evidence supports terminating Mother's parental rights to J.C. on mental illness grounds. Mother was diagnosed with narcissistic personality disorder. The Department made a diligent effort to provide appropriate reunification services, including individual counseling, parent aide services, supervised visitation, two psychological

evaluations, a bonding and best interests' assessment, MiKid parent-support services, urinalysis testing, and transportation.

¶18 Both Dr. Diana and Dr. Smart testified that as a result of Mother's narcissistic personality disorder, she put her and her boyfriend's needs before J.C.'s interests, rendering her unable to discharge her parental responsibilities. Mother dismissed J.C.'s allegation that her boyfriend had abused him and she was "dismissive of [J.C.'s] emotional needs." And even though J.C. said that he was afraid of Mother's boyfriend and did not want him at supervised visits, Mother nevertheless repeatedly asked the Department to let her boyfriend attend those visits. Despite J.C.'s allegation of abuse and his fear of Mother's boyfriend, Mother testified that J.C. would live with her and her boyfriend if he was returned to her. Moreover, when Mother visited J.C., she was often eager for the visits to end, watched the time, and focused on her other obligations at home. Mother also put the needs of her boyfriend before J.C. when attending visits: she refused transportation by the Department if the driver were male because her boyfriend "did not want her in the car with another man."

¶19 Finally, Mother's narcissistic personality disorder will continue for a prolonged indeterminate period. While Mother engaged in services, she made no progress in putting J.C.'s needs before her own. Rather, Mother's parent aide referral was closed out as unsuccessful because she made no progress in enhancing her protective capacities despite attending 25 sessions. Mother's second psychological evaluation in April 2020—completed more than a year after the first evaluation—showed that Mother made no progress despite her participation in services. At the termination hearing, Mother even testified that she does not need counseling because nothing is wrong with her. As a result, reasonable evidence supports the juvenile court's finding that Mother's personality disorder renders her unable to discharge parental responsibilities and that she will be unable to do so for a prolonged indeterminate period.

¶20 Mother argues that the Department did not make diligent efforts to provide reunification services because it did not offer her family therapy, therapeutic visitation, or parent-child interaction therapy. The Department is not required to offer every conceivable service, however, *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994), and need not offer services that would be futile, *Mary Ellen C.*, 193 Ariz. at 192 ¶ 34.

¶21 The case manager testified that J.C.'s behavioral health team did not think additional therapy between Mother and J.C. was in J.C.'s best

interest and therefore did not recommend additional services. Dr. Smart did not expect nor recommend the Department to provide additional services. And Dr. Diana recommended family therapy only after Mother had made "sufficient progress in individual therapy." Not only did Mother not make progress between March 2019 and April 2020, but Mother even testified that she did not need counseling because nothing was wrong with her. Based on Mother's lack of progress, the recommendations of J.C.'s behavioral team, and the results of Mother's psychological evaluations, the Department was not required to offer Mother additional therapy.

¶22 Mother argues next that termination of her parental rights was not in J.C.'s bests interests. She contends that J.C. wanted to return home with her, that his placement was taking care of four children, and that his placement was "often overwhelmed" and "lack[ed] the patience to deal with J.C.'s special needs." Termination of parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018). In determining whether the child will benefit from termination, relevant factors to consider include whether the current placement is meeting the child's needs, an adoption plan is in place, and if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016).

¶23 Reasonable evidence supports the juvenile court's finding that termination of Mother's parental rights was in J.C.'s best interests. The Department's case manager testified that J.C. was in an adoptable placement that was meeting his needs and that J.C. would be harmed if he were returned to Mother because his needs would not be a priority. Both Dr. Diana and Dr. Smart testified that if J.C. were returned to Mother, his needs would not be a priority and he would be at risk of emotional neglect and physical abuse. The juvenile court therefore did not err by terminating Mother's parental rights to J.C.

**CONCLUSION**

¶24 For the foregoing reasons, we affirm.

